**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-0051 (TJK)** |
| **v.** | : | |
| | : | |
| **BRYAN BETANCUR,** | : | |
|     also known as Bryan Clooney, | : | |
|     also known as Maximo Clooney | : | |
| | : | |
|         **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Bryan Betancur ("Betancur") to six months' incarceration, 12 months' supervised release, 60 hours of community service, and $500 restitution.

## I.    Introduction

The defendant, Bryan Betancur, while on probation in Maryland for a 2019 conviction of Burglary in the Fourth Degree (discussed in greater detail below), participated in the January 6, 2021 attack on the United States Capitol – a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[1]

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On May 5, 2022, Betancur pleaded guilty to one count of 18 U.S.C. § 1752(a)(1): Disorderly and Disruptive Conduct in a Restricted Building or Grounds.  As explained herein, a sentence of six months' incarceration, 12 months' supervised release, 60 hours of community service, and $500 restitution is appropriate in this case because: (1) the defendant, while on probation, twice lied to get permission to travel to Washington, D.C. to spend time with the Proud Boy at political rallies that became violent, including a December 12, 2020 rally and the January 6, 2021 riots; (2) he climbed scaffolding and later entered a sensitive area, specifically Room ST-2M, which is closed off to the public when the Capitol is open; (3) he assisted rioters in removing furniture from ST-2M, which was likely used as weapons in the nearby Lower West Terrace tunnel based, in part, on both surveillance video and publicly available videos depicting furniture pieces being used as weapons and projectiles in the tunnel; (4) violated the terms of his pretrial release after his plea; (5) lied to the FBI during a post-plea interview; and (7) has been uncooperative and hostile in even his most basic of communications with the Probation Office in preparation for this sentencing.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed.  Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification combined with the defendant's preparation for violence, his celebration and endorsement of the violence on that day, his lack of remorse, and the potential for future violence renders a significant jail sentence both necessary and appropriate in this case.

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. However, the attempted breach and officer assaults that occurred at the Lower West Terrace tunnel entrance to the Capitol Building, the location of perhaps the most violent confrontation on January 6, are deserving of further description as Betancur can be seen viewing and recording activity in that area prior to entering the Capitol.

### *Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building*

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.

*Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117  Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT").  The entrance usually

consists of a flight of stairs leading to a doorway.  On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.  That tunnel led to two sets of metal swinging doors inset with glass.  On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.  The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.  This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day.  "Inauguration at the U.S. Capitol", Architect of the Capitol,  https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



(*LWT Tunnel, circled in red, and Betancur's point of entry, circled in yellow*)

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.  Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance.  Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 PM, the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.  The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items. Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.  At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people.  And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me.  So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in.  That's about from the distance where I'm sitting here on the dais to that back wall.  And from that office in close proximity to where you all held the line, I listened to you struggle.  I listened to you yelling out to one another.  I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall.  And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."

Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer
Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the
United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available
at   https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.         The
violent and physical battle for control over the LWT entrance in the tunnel and doorway area
continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed,
and beat law enforcement officers.  The battle for the LWT entrance involved intense hand-to-
hand combat, and some of the most violent acts against law enforcement, including the abduction
and tasering of MPD Officer Michael Fanone and the previously mentioned assault of Officer
Daniel Hodges.

        During this battle, the vastly outnumbered officers were assaulted with all manner of
objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a
concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification,
and overturn the election results by force.  Capitol Police Sgt. Aquilino Gonell, who was present
in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We
> fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a
> violent mob intent on subverting our democratic process. My fellow officers and I were
> committed to not letting any rioters breach the Capitol. It was a prolonged and
> desperate struggle.

*Id.* (Statement of Sgt. Aquilino Gonell).  Despite the mob's efforts, the officers in the LWT held
the line with commendable restraint, and through personal sacrifice and valor.  MPD Officer
Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle
> remained cool, calm, and collected as he gave commands to his officers. "Hold the
> line," he shouted over the roar. Of course, that day, the line was the seat of our
> American government. Despite the confusion and stress of the situation, observing

> Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service.

*Id.* (Statement of Officer Michael Fanone).  Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 pm.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.  The actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

The Department of Justice publicly released a three-hour video from a camera inside the LWT tunnel ("Tunnel Video") that captures the assault from one vantage point.[2]

### **Bryan Betancur's Interests in the Proud Boys[3]**

In November 2020, Betancur was released from custody for a previous violation of his probation.  As part of the terms of his probation, Betancur was not allowed to leave the state of Maryland without permission from probation.  In December 2020, Betancur received permission from his probation officer to travel to Washington, D.C. on December 12, 2020[4] with the limited

---

[2] The full video entitled "Three Hours of U.S. Capitol Surveillance Video at the Tunnel from Jan. 6, 2021" is available at https://www.youtube.com/watch?v=_a3RGlu5yLs.

[3] Betancur, during his post-plea interview, discussed following a Proud Boys telegram channel and his knowledge of Proud Boys members, who he purportedly met at other rallies.  A review of his cellular telephone, which was seized subject to his arrest, indicates a prior attempt by Betancur to apply to become a Proud Boys member.  However, the FBI does not believe Betancur has an official affiliation with the Proud Boys.  Rather, the FBI believes that Betancur aspires to be an official Proud Boys member.

[4] On December 12, 2020, a rally occurred in Washington, D.C. that led to violent clashes leaving at least four people stabbed and nine people transported to the hospital, two of whom were law enforcement

purpose of traveling with Gideon International to distribute Bibles.  According to his probation officer, Betancur provided the probation officer with updates throughout the day and communicated that he would not be home by the normal curfew time.  However, according to a review of Betancur's cellular telephone, which was seized subsequent to his arrest, Betancur was in Washington, D.C. with Proud Boys members on December 12, 2020.  One of the recovered images depicted Betancur in a group of other individuals wearing Proud Boys insignia while holding up his right hand to display the "OK" sign, which is a hand gesture used by other Proud Boys members, as depicted in the same photograph, and other groups to signify, among other things, white power.

---

officers.  Clashes also occurred between the Proud Boys and counter protestors.  *See.*
https://www.npr.org/2020/12/12/945825924/trump-supporters-arrive-in-washington-once-again-for-a-million-maga-march.



*(Betancur, circled in red, while displaying the "OK" hand gesture)*

### **Bryan Betancur's Role in the January 6, 2021 Attack on the Capitol**

On January 4, 2021, Betancur sent a text message to his probation officer once again requesting permission to travel to Washington, D.C. on January 6, 2021.  Without receiving a response, Betancur then traveled to the Parole and Probation office in person on January 5, 2021 and made a formal request to his probation officer's supervisor to travel to Washington, D.C. in order to distribute Bibles.  The supervisor approved Betancur's request.

On January 6, 2021, while wearing a Global Positioning System ("GPS") enabled monitoring device under the terms of his Maryland probation,[5] Betancur traveled from Silver Spring, Maryland to Washington, D.C.  He wore a distinctive jacket with a Proud Boys shirt under the jacket.  According to Betancur's GPS-enabled monitoring device, Betancur, on January 6, 2021, traveled in the direction of the White House Ellipse before moving east, to the area around the west side of the U.S. Capitol Building.  Betancur remained in the vicinity of the U.S. Capitol, specifically inside the U.S. Capitol Police barricades, from approximately 2:00 p.m. to approximately 5:00 p.m.

According to Betancur, during a post-plea interview, after arriving in Washington, D.C., he attended the speeches and met with Proud Boys members.  Betancur then walked with the crowd towards the Capitol.  When he arrived at the Capitol, according to images posted on his social media account and publicly available video, Betancur climbed on top of the Inauguration scaffolding, which was erected on the northside of the West Plaza.  *See.* Exhibit 1 at 37 minute, 55 second.

---

[5] Maryland Department of Public Safety and Correctional Services, Division of Parole and Probation agents use an online software to monitor their clients' travel and adherence to court ordered curfews.



*(Betancur, circled in red (Exhibit 1 at 37:55))*

Based on a review of photographs recovered from Betancur's cellular telephone and the associated metadata, he was located in the vicinity of the scaffolding beginning at approximately 2:20 p.m. at the latest.  While on top of the scaffolding, he encountered an individual he recognized from other rallies and took a photograph with him, which he posted to his Instagram account (depicted below).



(*Betancur, circled in red, standing on the scaffolding*)

Betancur took other photographs while on the Capitol grounds, which he later posted to his Instagram account.  In one photograph, Betancur took a selfie-style photograph while making the same "OK" gesture as discussed above and posted another photograph of himself standing on the scaffolding with a Trump 2020 flag.

 

After leaving the scaffolding area, Betancur entered the LWT and ultimately made his way towards the area outside Room ST-2M, which is a conference room on the Senate side of the U.S. Capitol Building used by staffers to assist the functioning of the U.S. Senate. Accordingly, this is a sensitive space, not otherwise opened to the public even during times when the Capitol building is open for public tours. At the time Betancur approached this area, neither of the upper windows of ST-2M appear to be completely broken into yet.



*(Betancur, circled in red, and the upper windows of*
*ST-2M circled in yellow (Exhibit 1 at 1:14:44)*)

Betancur then stood between the area outside of ST-2M and the LWT tunnel and archway leading into the Capitol building, which was the location of significant assaults on that day.  As discussed above, the violent and physical battle for control over the LWT tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers.  Rioters also used makeshift weapons and projectiles from the furniture removed from ST-2M.  While in this area, Betancur filmed and/or photographed the activity occuring in the area immediately outside of the tunnel and continued to move closer towards the tunnel, standing between the tunnel and ST-2M, which now has a completely broken upper right window.



*(Betancur, circled in red, taking a photograph and/or video of*
*to the area in front of the LWT tunnel (Exhibit 1 at 1:18:32))*

Moments before and after the above image, the video depicts some of the assaults occuring in the tunnel.  Moments later, Betancur moved closer to the broken ST-2M window, where he stood in front of the broken window.  The video shows Betancur facing the direction of the tunnel and filming/photographing the area again.



*(Betancur, circled in red, and tunnel circled in yellow (Exhibit 1 at 1:20:02))*

Moments later, Betancur is at the base of the window as several pieces of furniture are removed.  For example, what appears to be a broken table leg is removed from the window of ST-2M.



*(broken table leg circled in red (Exhibit 1 at 1:20:07))*

As discussed above, hours of video capturing the assaults in the tunnel were publicly released. Video from this area revealed furniture being used as weapons.



Three Hours Of U.S. Capitol Surveillance Video at the Tunnel from Jan. 6, 2021.

*(Rioter holding a broken table leg, circled in red, which was later swung at officers)*

After what appeared to be a table leg was removed from the window, Exhibit 1 pans to the tunnel, again depicting assaults occuring at the nearby tunnel.  Notably, one of the ST-2M windows had not been broken yet.  Betancur continued to remain in the area and film/photograph the area.



(*Betancur, circled in red, and tunnel, circled in yellow (Exhibit 1 at 1:22:40)*)

While in this area, Betancur assisted in the removal of furniture from ST-2M, including a table and a chair, towards the crowd.  Exhibit 1 depicts the table being passed in the direction of the tunnel.  However, the video does not ultimately depict where the table ended up.



*(Betancur, circled in red, helping a rioter move a table
from ST-2M (Exhibit 1 at 1:23:22))*



*(Betancur, circled in red, and the table he helped remove from ST-2M, circled in yellow, going
towards the LWT tunnel (Exhibit 1 at 1:23:38))*

Prior to assisting in the removal of this table, Betancur reached his hand upward towards a rioter standing next to the unbroken window.  Betancur then proceeded to take the rioter's flag poles while the rioter attempted to break the window with a bat.  Another video available at the time the window is being smashed, although still intact, does not appear to depict Betancur still in the area immediately in front of the window.



*(Betancur, circled in red, grabbing the flagpoles from a rioter (Exhibit 1 at 1:23:15))*



*(rioter attempting to break window with bat, circled in blue, and
Betancur, holding the flags, circled in red (Exhibit 1 at 1:23:30))*

Video recorded by another January 6 defendant revealed that the window was ultimately broken.  It is through this window that Betancur entered ST-2M, while an unhinged door is being removed from the other broken window.



(*Betancur, circled in red, entering ST-2M*)

While inside of the office, Betancur observed broken furniture throughout the conference room, which was ransacked by the time Betancur entered.  He also posed for a photograph holding a Trump 2020 flag, which based on the metadata associated with the cellphone image was taken at approximately 5:02 p.m.[6]

---

[6] While the exact entry and exit times are unknown, Betancur is believed to have been inside of the Capitol building for a relatively brief period of time.



*(Betancur posing for a photograph inside of ST-2M)*

On January 7, 2021, Betancur called his probation officer and informed her that he had been inside of the U.S. Capitol building on January 6, 2021. He informed her that he had been tear gassed during the events that day. Betancur told his probation officer that he was paranoid about photographs people had taken of him. He also believed the FBI was watching him. However, Betancur later recanted to his probation officer about being inside of the Capitol but maintained that he had been tear gassed.

*Betancur's Post-Plea Activities*

As discussed in the PSR, on June 23, 2022, Betancur participated in a presentence interview with his attorney present. According to the PSR, Betancur was "hostile and non-cooperative [and] would not provide basic contact information, familial information, or other general information." PSR at ¶47. During the interview, Betancur also responded to questions with inappropriate personal questions directed towards the interviewing officer. According to the report, Betancur "frequently gave obvious false or misleading answers[.]" *Id.* at ¶48.

The following day, on June 24, 2022, a Metro rider reported another rider harassing patrons on the train.  The Metro rider advised that the individual, later identified as Betancur, was yelling racial slurs on the train, including the "N word."  Betancur also reportedly referred to black people as losers, criminals and having no jobs.  The Metro rider also reported that Betancur had a folding knife in his hand as he was leaving the station.  Betancur was stopped by police officers and verbally counseled prior to leaving the area without being arrested.

*Bryan Betancur's Post-Plea Interview*

On July 11, 2022, pursuant to the terms of his plea agreement, Betancur, with his attorney present, was interviewed by the FBI.  Betancur explained that he was already familiar with the Proud Boys from attending other rallies and from his activities on Telegram, which he noted was encrypted.  He initially heard about the events planned for Washington, D.C. through social media and Telegram.  On January 6, 2021, he traveled to Washington, D.C. and made his way to the area near the Washington Monument to hear the speeches.

While at the rally, he observed the Proud Boys leaders conversing and then a large crowd started to move towards the Capitol Building.  He observed some individuals with radios and identified some as militia.  He also walked towards the Capitol with the crowd.  At the Capitol, he took photographs on the scaffolding with a man from Texas, who Betancur knew from prior rallies and Trump events.

Betancur observed a woman with a loudspeaker telling people to go in "there" and fight for freedom.  Betancur stated, multiple times during his interview, that he only went into the Capitol for his safety.

During this interview, Betancur made several false statements.  For example, he made statements about other individual(s) being at the Capitol, but based on FBI investigation, those

individual(s) were not at the Capitol. Betancur also inquired why certain identified individuals had not been arrested. In addition to statements involving other individuals, he made false statements about himself. For example, when asked how he traveled to Washington, D.C. on January 6, Betancur stated that he drove. When asked about how he drove given he did not have a driver's license, Betancur stated he had a driver's permit at the time. Next, the FBI asked, since Betancur claimed to only have a driver's permit, who was in the car with him during the drive. Betancur initially said a female. However, when pressed for additional information, Betancur recanted and said he drove by himself. Records provided by Maryland Department of Transportation confirmed that Betancur did not possess a driver's permit on January 6, 2021. Rather, he was issued an ID-only card.

Betancur also, at one point, asked if the interviewing agent was present at the Capitol on January 6. Betancur commented that he heard that law enforcement planned the Capitol riot and stated multiple times that he heard it was an "inside job." Betancur also emphatically claimed that the 2020 election was stolen. Betancur also asked for the identity of whoever reported him to the FBI.

When asked if he regretted the decisions he made on January 6, 2021, Betancur stated he did not live a life of regrets. However, he added that he only regrets that the actions he took now prevent him from joining the U.S. military. Betancur wanted to join the U.S. military because of the sense of brotherhood. If he is unable to join the U.S. military, Betancur said that he may attempt to join a different country's military or become a mercenary.

After the interview concluded, and as Betancur and his attorney were exiting the room, Betancur flashed the "OK" hand gesture, similar to the ones in the above-depicted photographs, to the interviewing agent. This observation was then relayed to his counsel.

The July 11, 2022 interview occurred in the U.S. Attorney office space in the courthouse, and the interview concluded prior to 11:00 a.m.  As part of Betancur's release conditions, Betancur is to stay away from Washington, D.C. except for business with PSA, meetings with his counsel, or court proceedings.  At approximately 1:00 p.m., the interviewing FBI agent observed Betancur outside of the Courthouse.

*The Charges and Plea Agreement*

On January 27, 2021, Bryan Betancur was charged by Information with violating 18 U.S.C. §§ 1752(a)(1), 1752(a)(2), and 40 U.S.C. §§ 5104(e)(2)(C), (D), and (G).  On May 5, 2022, Betancur pleaded guilty to Count One of the Information charging him with a violation of 18 U.S.C. §1752(a)(1), Entering and Remaining in a Restricted Building or Grounds.  By plea agreement, Betancur agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

The defendant now faces a sentencing on a single count of violating 18 U.S.C. § 1752(a)(1).  He faces up to one year of imprisonment and a fine of up to $100,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of

individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government's Sentencing Guidelines calculation set forth in the plea agreement differs from the calculation set forth in the PSR, and the government agrees with the calculation in the PSR.  According to the PSR, the U.S. Probation Office calculated Betancur's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | 2 |
| Total Adjusted Offense Level | 6 |

*See* PSR at ¶¶ 28-37.

The U.S. Probation Office determined that Betancur has not clearly demonstrated acceptance of responsibility for the offense and provided incomplete or misleading information in respect to the presentencing investigation.  PSR at ¶¶27 and 36.  Accordingly, the U.S. Probation Office determined that Betancur does not merit a two-point reduction for acceptance of responsibility.  The plea agreement stated that the government would agree that Betancur was eligible for a two-level reduction for acceptance of responsibility under USSG §3E1.1(a), absent certain circumstances indicating conduct inconsistent with acceptance.[7]  As noted above, Betancur provided false statements during his post-plea interview, including repeatedly stating that he only went into the Capitol for his safety and insisting that the siege of the Capitol may have been an inside job.  After his plea, Betancur was unwilling to fully participate in his

---

[7] The plea agreement states

> The Government agrees that a 2-level reduction will be appropriate, pursuant to U.S.S.G. §3E1.1, provided that your client clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through your client's allocution, adherence to every provision of this Agreement, and conduct between entry of the plea and imposition of sentence.

Plea Agreement, ECF No. 34, at 3.

presentence interview with probation, providing false information and making inappropriate commentary to the interviewing officer.  Additionally, he violated the terms of his conditions of release by remaining on the grounds of the District Court of D.C. hours after his post-plea interview and allegedly harassed Metro riders with derogatory language.  Accordingly, the government defers to Probation's determination of whether Betancur should no longer be entitled to a two-point reduction for acceptance of responsibility.

The U.S. Probation Office also calculated Betancur's criminal history as a category III, which differs from the calculation in the plea agreement. PSR at ¶¶ 39 - 42.  Betancur's plea agreement contains an explicitly non-binding "Estimated Guidelines Range" of 0-6 months, which was based on an "Estimated Criminal History Category" of I (because Betancur was "estimated to have I criminal history point").  ECF No. 34 at 3-4.[8]  The PSR correctly calculates Betancur's criminal history category as III (for five criminal history points).  The plea agreement did not account for (1) the 2021 probation revocation that resulted in 18 months of jail time for the Fourth Degree Burglary charge (three points, pursuant to U.S.S.G. § 4A1.1(a)) and (2) the fact that the defendant committed the offense at-issue in the instant case while he was still under a criminal justice sentence for the Fourth Degree Burglary charge (two points, pursuant to U.S.S.G. § 4A1.1(d)).  PSR at ¶¶ 39-41.  Accordingly, because the U.S. Probation Office correctly calculated Betancur's total adjusted offense level at 6 and his criminal history category as Category III, his corresponding Guidelines imprisonment range is 2 - 8 months. PSR at ¶ 75.  The government believes that U.S. Probation Office's calculation is correct.  However, it is worth noting that the

_____

[8] The plea agreement states that the defendant "acknowledges that after the pre-sentence investigation by the United States Probation Office, a different conclusion regarding [the defendant's] criminal convictions and/or criminal history points may be reached and [the defendant's] criminal history points may increase or decrease." ECF No. 34, at 3.  The plea agreement also states that "the parties are free to argue for a Criminal History Category different from that estimated" in the plea agreement. *Id.* at 4.

government's sentencing recommendation still falls within the original, albeit incorrect, estimation of 0-6 months incarceration.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S. at 349. As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States
> Sentencing Commission's in-depth research into prior sentences,
> presentence investigations, probation and parole office statistics,
> and other data. U.S.S.G. §1A1.1, intro, comment 3. More
> importantly, the Guidelines reflect Congress's determination of
> potential punishments, as set forth in statutes, and Congress's
> on-going approval of Guidelines sentencing, through oversight of
> the Guidelines revision process. See 28 U.S.C. § 994(p) (providing
> for Congressional oversight of amendments to the Guidelines).
> Because the Guidelines reflect the collected wisdom of various
> institutions, they deserve careful consideration in each case.
> Because they have been produced at Congress's direction, they
> cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of

the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in

misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants.  The defendant's lack of violence and property destruction is the only reason he was charged only with, and permitted to plead to, a misdemeanor rather than felony.

Betancur, who follows the Proud Boys activities and flashed white supremacy hand gestures associated with the Proud Boys directly to the FBI, lied to his probation officer about wanting to travel to Washington, D.C. to attend the Stop the Steal rally.  Betancur, who previously traveled to Washington, D.C. under the same false pretense of distributing Bibles, once again joined up with the Proud Boys at the Ellipse.  He then eventually made his way to the Capitol and spent some time on and near the Inauguration scaffolding starting, at the latest, around 2:20 p.m. At one point, Betancur climbed scaffolding, which was erected in anticipation of the Inauguration. At the top of the scaffolding, he would have had an aerial view of the violence unfolding on the grounds below, where rioters were assaulting officers to push past them and go further to the Capitol building.  While on the scaffolding, he posed for a photograph, while holding one end of the confederate flag.

Betancur then made his way towards the area outside of ST-2M and stood between that area and the LWT tunnel, where some of the most violent assaults occurred on officers.  Betancur began to film and/or photograph the activity occurring in that area.  He then made his way closer to the windows leading into ST-2M.  While in that area, he assisted his fellow rioters move furniture out of ST-2M.  Notably, the rioters attacking officers in the tunnel used pieces of furniture, many of which came from ST-2M, as weapons during their assaults.

Betancur ultimately entered the sensitive space of ST-2M, where he posed for picture amidst a destroyed conference room.  He stayed momentarily before leaving ST-2M through a window, since he could not go further into the Capitol.

Betancur claimed multiple times during his post-plea interview that he went into the office for his safety. However, everything about his activity up to that moment of entry counters any notion he feared for his safety. He climbed scaffolding and would have had a view of the violence unfolding below. When he descended the scaffolding, rather than walk away from the violence unfolding at the threshold of the Capitol, he made his way closer to the most violent area of the Capitol. He then had the composure to film what was unfolding in that area before assisting fellow rioters in removing furniture from ST-2M, some of which were likely used as weapons against the officers. None of this could arguably have been done out of fear. Betancur saw the violence unfold and wanted to assist his fellow rioters carry out their attacks on officers protecting the Capitol.

Betancur lacks remorse for his actions or what transpired on January 6, 2021. He repeatedly stated the false notion that he only went into the Capitol building for fear of safety. This idea flies against all logic of what transpired before he entered the Capitol via ST-2M. Additionally, when directly asked during his post-plea interview if he had any regrets regarding his actions on January 6, 2021, he simply stated he lives a life of no regrets. However, he did add that his only regret is the ramifications of his activities on his desire to join the military. Yet, he further stated that if he cannot join the U.S. military, he will join another country's military or serve as a mercenary. He also asked the interviewing agent if he was at the Capitol since he has heard it was an inside job, a claim he repeated multiple times during the interview. Betancur also falsely stated that the election was stolen. Not only does Betancur have no true remorse over his actions, but he continues to spout false rhetoric over what led to and transpired on January 6, 2021.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Betancur's criminal history consists of an April 12, 2019 misdemeanor conviction of Burglary in the Fourth Degree. *State of Maryland v. Bryan Betancur,* 03-k-19-000698.  In that case, Betancur was observed inside of an elementary school.  Betancur told the arriving officer that he needed to charge his phone and noticed that the school doors were unlocked.  He purportedly went inside of the school to charge his phone.

During the pendency of his Maryland sentence, Betancur's probation was revoked on several occasions, and he was still on probation on January 6, 2021.  While on probation, he lied to his probation officer in order to receive permission to go to Washington, D.C. on two occasions, including January 6, 2021.  Similar to his disregard to abiding by the terms of his probation, Betancur has disregarded the terms of his current release.  On July 11, 2022, he traveled to the U.S. Courthouse to participate in a post-plea interview involving his attorney, the FBI, and the U.S. Attorney's office.  Remaining in Washington, D.C., more specifically the courthouse grounds, for at least two hours after the interview violated the terms of his release.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[9]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the

---

[9] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry.  Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society.  Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing); *see United States v. Mariposa Castro,* 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur.  And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.") ( statement of Judge Walton at sentencing).

The gravity of these offenses demands deterrence.  This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Betancur's method of getting approval to travel to Washington, D.C. on January 6, 2021 while on probation, his post-plea interview, and his activities in violation of the terms of his release conditions clearly demonstrate the need for specific deterrence for this defendant.  After having an eagle's eye view of the chaotic, violent scene unfolding on the Capitol grounds from the upper

level of the Inauguration scaffolding, Betancur descended scaffolding, moved closer to the violence, filmed the activities, and assisted fellow rioters in removing Capitol building furniture, which may have been used as weapons against officers.  These are all indications that Betancur supported and encouraged the violence unleashed by his fellow rioters on the officers protecting the Capitol building.  Betancur posted pictures and videos of the Capitol to his social media account.

Since his plea, Betancur has engaged in inappropriate and harassing behavior.   On June 23, 2022, during his interview with probation in connection to this presentencing report, he was uncooperative and hostile, including making racially motivated comments, such as of course he had a job because he is not Jewish.  On June 24, 2022, Betancur allegedly engaged in harassment of individuals on the Metro and threatening behavior, using racial slurs against other passengers and reportedly holding a folding knife is his hand while exiting the station.  Betancur has clearly demonstrated his inability to refrain from harassing, hostile, threatening, and uncooperative behavior both with law enforcement and the public at large.

As of July 11, 2022, Betancur continued to repeat false conspiracy theories that the siege at the Capitol may have been orchestrated by law enforcement.  He also repeated the false propaganda that the election was "stolen."  As of the date of this filing, Betancur has not expressed any true remorse for his part on January 6, 2021 or what transpired on Capitol grounds generally that day.  Rather, he is only concerned with his ability to join the U.S. military.  The government acknowledges that Betancur pleaded guilty and took responsibility for his actions on January 6, 2021 and participated in a post-plea interview.  However, his false statements to the post-plea interviewing agent, including but not limited to falsely saying he had a learner's permit on January 6, 2021 and that he only entered the U.S. Capitol for his safety; his in ability to abide by the terms

of his release conditions; his hostility and lack of cooperation during his presentencing interview; his alleged harassment of passengers on public transportation; and his total lack of remorse underscore the need for specific deterrence in this case.  In this case, Betancur's activities after January 6, 2021 and the fact that he committed this current crime while on probation, demonstrate a very real need for specific deterrence in the form of incarceration.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[10] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[11] Indeed, the government invites

---

[10] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[11]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases

constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed in *United States v. James Bonet,* 21-cr-121 (EGS); *United States v. Phillip Bromley,* 21-cr-250 (PLF); *United States v. Mariposa Castro,* 21-cr-299 (RBW); *United States v. Adam Avery Honeycutt,* 22-cr-50 (CJN)*; United States v. Annie Howell,* 21-cr-217 (TFH); and *United States v. Kelly O'Brien,* 21-cr-633 (RCL). While no two cases will be identical, it is notable that none of the below cited cases contain the same post-plea behavior Betancur displayed, particularly his interactions with probation during the presentencing interview, or his misrepresentations to probation while being on probation.

In *Bonet,* the defendant, who had a criminal history category of II, filmed various moments of his approach to the Capitol building and how the rioters were entering the building. The defendant then entered Senator Merkley's office, which similar to ST-2M is a sensitive area. However, unlike Betancur, the defendant did not remain and witness the violence unfolding at the tunnel immediately prior to entering the Capitol nor did he assist in the removal of furniture from the Capitol. The defendant remained there for approximately four minutes and smoked marijuana. The defendant then left the office, went to the Crypt before eventually leaving the Capitol building at approximately 3:26 p.m. After his plea, the defendant gave an interview where he described the protest as peaceful and said he went into the Capitol to learn the truth. The defendant pled guilty to violating 18 U.S.C. § 1752(A)(1). The government recommended 45 days' incarceration and

one year of probation.  The Court sentenced the defendant to 90 days' incarceration, one year of probation, 200 hours' community service, and $500 in restitution.

In *Bromley,* the defendant anticipated violence on January 6, 2021 and expressed increasingly violent rhetoric as January 6, 2021 approached.  The defendant, on January 6, 2021, witnessed his cousin assault an officer and later witnessed the shooting of Ashli Babbitt.  He also participated in property destruction.  Similar to Betancur, the defendant was not truthful during an interview with the government during the defendant's post-arrest, pre-plea debrief.  The defendant pled guilty to violating 18 U.S.C. § 1752(A)(1).  The government recommended the top end of the guidelines range calculated by the Court, which in this case was 12 months' incarceration, one year of supervised release, 60 hours of community service, and $2,000 in restitution.  The Court sentenced the defendant to 90 days' incarceration, one year' supervised release, and $2,000 in restitution.

In *Castro,* the defendant went to the U.S. Capitol after watching what was occurring on the news.  While at the Capitol, she stood outside of ST-2M and livestreamed the activity to her followers.  The defendant also entered the ransacked ST-2M and documented her fellow rioters both inside and outside of ST-2M.  During her post-arrest interview, she falsely stated that the people being violent were Antifa and Black Lives Matter, not Trump supporters.  Unlike Betancur, the defendant did not have a prior criminal record.  The defendant plead guilty to 40 U.S.C. §5104(e)(2)(G).  The government recommended two months' incarceration, and the Court imposed 45 days' incarceration.

In *Honeycutt,* similar to Betancur, the defendant entered a sensitive space of the Capitol via a broken window.  While inside the Capitol, he took a picture of a broken table leg.  He also made multiple postings to social media accounts.  After exiting the Capitol, he assisted in the

movement of a large beam of wood towards the tunnel, which could have been used as a weapon against officers.  Similar to Betancur, the defendant stood near the violence unfolding in the tunnel. At the time of his arrest, he was found to be in possession of multiple firearms and drug paraphernalia.   While the defendant, similar to Betancur, had a prior criminal record, the defendant, unlike Betancur, was not on probation while he was committing crimes on January 6, 2021.  Prior to his sentencing for the January 6th case, the defendant plead guilty to the firearm charges and was sentenced to 18 months' imprisonment and 12 months' supervised release.  The defendant plead guilty to 40 U.S.C. §5104(e)(2)(G).  The government recommended 90 days' incarceration to be served consecutively to the defendant's current term of incarceration for unrelated charges, 36 months' probation, 60 hours of community service, and $500 in restitution. The court sentenced the defendant to a term of 90 days' incarceration to be served consecutively with his current term of incarceration and $500 in restitution.

In *Howell*, the defendant went to the Capitol after viewing the riot unfold on television. She entered a sensitive area of the Capitol via a broken window.  Similar to Betancur, she was present for the violence unfolding at the tunnel.  Unlike Betancur, Howell did not handle broken furniture or pass items to other rioters.  She also does not have a prior criminal record.  The defendant plead guilty to 18 U.S.C. § 1752(a)(1).  The government recommended two months' incarceration, 36 months' probation, and $500 in restitution.  The court sentenced the defendant to 60 days' intermittent incarceration as a term of probation, 36 months' probation, and $500 in restitution.

In *O'Brien*, who also had a prior criminal record, in the months leading up to the siege of the U.S. Capitol, the defendant made multiple social media posts encouraging others to go to Washington, D.C. on January 6, 2021.  The defendant then filmed her journey towards the Capitol

building and posted the videos to her Facebook account.  She then entered the Capitol via the Senate Wing doors.  While outside of the Speaker of the House's office suite, the defendant encouraged others to cause destruction to the area and then proceeded to walk through Nancy Pelosi's office suite, which, similar to ST-2M, is a sensitive area of the Capitol.   While she herself did not commit destruction, after exiting the office suite, she cheered on another rioter who removed a sign, which was later destroyed, identifying the Speaker of the House's office.   Unlike Betancur, the defendant did not assist in the removal of items from the Capitol, which may have been used as weapons against the officers.  The defendant pled guilty to violating 18 U.S.C. § 1752(A)(1).  The government recommended five months' incarceration and $500 in restitution. The Court sentenced the defendant to 90 days' incarceration and twelve months of supervised release.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Betancur to six months' incarceration, 12 months' supervised release, 60 hours of community service, and $500 restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:      /s/  *Maria Y. Fedor*
MARIA Y. FEDOR
Attorney, detailed to the
United States Attorney's Office for the
District of Columbia
D.C. Bar No. 985823
601 D Street, N.W.
Washington, DC 20530
Maria.Fedor@usdoj.gov