**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Crim. No.  21-051 (TJK)** |
| | ) | |
| **BRYAN BETANCUR** | ) | |
| | ) | |
| | ) | |

---

**<u>DEFENDANT'S MEMORANDUM IN AID OF SENTENCING</u>**

"I felt power where I felt powerless.

I felt a sense of belonging where I felt invisible."

Tony McAleer

On the morning of January 6th, Bryan Betancur was one of thousands of people who came to the U.S. Capitol, believing a falsehood advertised to millions – that former Vice President Mike Pence had the power to overturn the "fraudulent election."  As a result, he traveled to Washington, D.C., to "Stop the Steal."

Months prior to the 2020 election, Former President Trump made proven-to-be false claims attacking the security of mail-in ballots and about the possibility of a rigged election.[1]  He tweeted a month before the election, that this would be "the most corrupt Election in American history!"[2]   On November 3, 2020, approximately, 74 million people voted for Trump in the 2020 election.  He declared that he won the election.[3]  By this time, 74 million people were likely acclimated to the propaganda that if Trump did not win, the election was stolen.  Trump and his supporters repeated this falsehood.   And it stuck.

> Trump's claim is **persuasive** to many because the idea was already **part of their DNA**. It is not that difficult to believe Biden did not win legitimately when your mind is made up and not open to persuasion, especially when you are **continually bombarded with conspiracy theories and unsubstantiated claims by Trump, social media, and news sources designed to undermine the validity of the**

---

[1]     Steve Inskeep, *Timeline: What Trump Told Supporters For Months Before They Attacked*, NPR Politics, February 8, 2021, available at https://www.npr.org/2021/02/08/965342252/timeline-what-trump-told-supporters-for-months-before-they-attacked (last viewed on Aug. 4, 2022); see also Alexandra Hutzler, *Trump Started Tweeting About Election Fraud in April 2020, Eight Months Before Capitol Riot*, Newsweek, February 10, 2021, available at https://www.newsweek.com/trump-started-tweeting-about-election-fraud-april-2020-eight-months-before-capitol-riot-1568365 (last viewed on Aug. 4, 2022)

[2]     John Woolley and Gerhard Peters, *Donald J. Trump Tweets of October 7, 2020,* at 02:14:11, The American Presidency Project, U.S. Santa Barbara, available at https://www.presidency.ucsb.edu/documents/tweets-october-7-2020 (last viewed on Aug. 4, 2022)

[3]     Inskeep, footnote 2 *supra*.

**results.**[4]

In other words, this falsehood became more than a "truth" to many – it would be a reality for which they would risk everything.  Mr. Betancur risked everything by attending the rally while on supervision and wearing a Proud Boys shirt.  He faced unbelievable media scrutiny, which was and remains unbearable for a 22 year old like him.  He struggles with mental health issues, which he does not and cannot bring himself to discuss.  Instead, he puts on a brave face and at times, tries to make jokes in light of his daily struggle with mental health.  His desire to be part of a group is more painful and in many ways makes his mental health issues more complex.  One thing is clear – the propaganda he was bombarded with provided him a sense of identity with a group that exhibited strength.  It gave him a group of people to connect with, people who were seen as an outsider like him.  They embraced him when others would not.

After January 6th, Mr. Betancur was sentenced to 18 months of prison in his Maryland cases, because of his conduct in this case.  Since his release, he has not been arrested for any new offenses and has obtained employment.  The government requests an extremely high sentence for this case, not based on his conduct as compared to others.  Mr. Betancur should not be punished for his political beliefs.  He should not be punished for his mental health struggles.  He should not be punished for his desire to belong to a group, where he committed no acts of violence.

---

[4]     Stephen Stathis, *Why do so many still believe the 2020 election was stolen?*, The Hill, April 11, 2022, available at https://thehill.com/opinion/campaign/3263802-why-do-so-many-still-believe-the-2020-election-was-stolen/ (emphasis added; last accessed on Aug. 4, 2022).

He should only be judged for his conduct in this case.  He accepted responsibility and is remorseful for his conduct.  For these reasons and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a), the defense respectfully requests a sentence of one month incarceration with no supervision to follow, which would be a sentence not greater than necessary to address his conduct in this case.

## TIMELINE OF JANUARY 6th EVENTS

The timeline of January 6th is well-known.  Approximately 30,000 people were expected to attend.[5]  Around 6 a.m that day, numerous Trump supporters headed towards the rally at the Ellipse and "[m]any began gathering the night before."[6]  The vitriol and antagonistic speech spread over the crowd of thousands.  Mr. Betancur attended the speech.  Prominent Trump supporters encouraged the crowd to march to the Ellipse and fight:

| | |
|---|---|
| **11 a.m.** | High-profile figures of the Republican Party spoke directing the Trump supporters:<br>• Representative Mo Brooks (R-Ala.) urged "American patriots" to "**start taking down names and kicking ass**."[7] |

---

[5]    Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants.  *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.

[6]    George Petras, Janet Loehrke, Ramon Padilla, Javier Zarracina and Jennifer Borresen, *Timeline: How the storming of the U.S. Capitol unfolded on Jan. 6*, USA Today, Updated Feb. 9, 2021, available at https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022).

[7]    *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554 (emphasis added).

- Katrina Pierson stated, "Americans will stand up for themselves and protect their rights, and they will demand that the politicians that we elect will uphold those rights, or **we will go after them**."[8]
- Amy Kremer, one of the organizers of the "Save America" rally and moderator of the "Stop the Steal" Facebook group, echoed others' calls for Republican lawmakers to challenge the election result and **"punch back from Donald Trump."**[9]
- Lara and Eric Trump, the president's daughter-in-law and son, encouraged the attendees **to march on the Capitol to "stand up for this country and stand up for what's right."**[10]
- Donald Trump, Jr. narrated that "You have an opportunity today: **You can be a hero, or you can be a zero**. And the choice is yours but we are all watching."[11]
- Rudy Giuliani, President Trump's personal attorney also spoke, making his now-infamous call for "**trial by combat**."[12]

An hour later, former President Trump took the stage and implored

attendees to "fight" for him, notably stating:

| **12 p.m.** | We will not let them silence your voices. . . **we're going to walk down to the Capitol**, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate |

---

[8]   *Id.* (emphasis added).

[9]   *Id.* (emphasis added).

[10]   *Id.* (emphasis added).

[11]   *Id.* (emphasis added).

[12]   *Id.* (emphasis added).

|  | president. That's what you'll have. And we can't let that happen.[13] |
|---|---|
| **1:10 p.m.** | And we fight. **We fight like hell. And if you don't fight like hell**, you're not going to have a country anymore. . . So we're going to, we're going to walk down Pennsylvania Avenue. I love Pennsylvania Avenue. **And we're going to the Capitol**, and we're going to try and give.[14] |

By this time, his supporters started heading towards the Capitol and started

fighting with the police.

| **1:10 p.m.** | Supporters "begin grappling with police on the Capitol steps." [15] |
|---|---|
| **1:30 p.m.** | After Trump's speech, "supporters being marching toward the U.S. Capitol."[16] |
| **2:11 p.m.** | Photographs indicate that supporters moved past the police lines on the west side of the Capitol and others scale the walls.[17] |
| **2:17 p.m. – 5:10 p.m.** | Mr. Betancur is in the vicinity U.S. Capitol, according to his GPS coordinates. |

---

[13]    *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[14]    *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial; see also Petras, *Timeline*, footnote 6 supra, https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022) (emphasis added).

[15]    Petras, *Timeline*, footnote 6 supra.
[16]    Shelly Tan, Youjin Shin and Danielle Rindler, *How one of America's ugliest days unraveled inside and outside the Capitol*, The Washington Post, https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/ (last accessed on Feb. 28, 2022).
[17]    Petras, *Timeline*, footnote 6 supra.

The length of time Mr. Betancur was inside the Capitol is unknown.  The
government acknowledged that he was inside the building "for a relatively brief
period of time."  ECF No. 39 at 22, n. 6.  There is no Capitol surveillance footage
provided for this case showing when Mr. Betancur entered the Capitol.

## LEGAL PRINCIPLES

Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. §
1752(a)(1), is a class A misdemeanor, as defined by 18 U.S.C. § 3559(a)(6), because
it carries a maximum incarceration period of one year.  The United States
Sentencing Guidelines apply to class A misdemeanors and, as argued further below,
suggest that a sentence between zero and six months would be appropriate, based
on Mr. Betancur's criminal history points and a total offense level of 4.  The law
states Mr. Betancur is eligible for probation because this offense is a misdemeanor.
18 U.S.C. § 3561(c)(2).

## <u>Sentencing Law</u>

### 1.  History – From unfettered discretion to Guideline bound.

For 200 years, federal judges had wide discretion when it came to sentencing
and could sentence how they saw fit and "there was virtually no appellate review of
the trial judge's exercise of sentencing discretion."[18]  Former federal judge, Marvin
E. Frankel was the "most influential critic[] of indeterminate federal sentencing"

---

[18]     Kate Stith & Steve Y. Koh, *The Politics of Sentencing Reform: The Legislative
History of the Federal Sentencing Guidelines*, 28 WAKE FOREST L. REV. 223, 225
(1993).

and in 1972, he published a "forceful …. indictment of the sentencing authority he himself exercised--powers which he described as 'almost wholly unchecked and sweeping' and which he found 'terrifying and intolerable for a society that professes devotion to the rule of law.'"[19]   Judge Frankel called for a "Commission on Sentencing" and the enactment of laws to make guidelines that would be "binding" on federal judges.[20]   Congress answered Judge Frankel's call and in 1984 the Sentencing Commission was born.  For decades, the U.S. Sentencing Guidelines were binding.

The era of binding guidelines ended seventeen years ago, when the Supreme Court held that "the Federal Sentencing Reform Act of 1984…ma[de] the Guidelines effectively **_advisory._**"  *United States v. Booker*, 543 U.S. 220, 245 (2005) (emphasis added).  Under *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."  *Id.* at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)).  While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the Supreme Court in *Booker* held that courts must consider <u>all</u> the purposes of sentencing set forth in 18 U.S.C. § 3553(a).  Overall, in light of *Booker*, courts must treat the Guidelines as <u>one</u> among several of the sentencing factors.

18 U.S.C. § 3553(a) provides that the Court must consider:

(1) the nature and circumstances of the offense and the history and

---

[19]     *Id.* at 228.
[20]     *Id.*

characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines— (i)issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; …

(5) any pertinent policy statement— …

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. §

3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. 18 U.S.C. § 3661.

Congress has further provided that:

[t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.*

18 U.S.C. § 3582(a) (emphasis added). With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." *Id.* § 3553(a) (emphasis added).

## 2. The Sentencing Guidelines are *only one factor*, thus Courts must not anchor themselves to the Guidelines.

Since *Booker*, the Supreme Court reaffirmed that the Sentencing Guidelines are merely one factor to be considered by district courts when fashioning a reasonable sentence and that the Sentencing Guidelines are not to be weighed more heavily than other sentencing factors. *See Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007). A sentencing court shall not simply presume that a sentence within the Guideline range is automatically reasonable or

that a sentence within the Guideline range is more reasonable than a sentence outside of the Guideline range. *Rita*, 551 U.S. at 338; *Gall*, 552 U.S. at 46. The sentencing court further shall not presume that a sentence outside of the Guidelines range is unreasonable. *Id.* By considering the Sentencing Guidelines along with all of the factors set forth 18 U.S.C. § 3553(a), "the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure." *Rita*, 551 U.S. at 351.

It is critical for sentencing courts to consider all sentencing factors and to not give undue weight to the Sentencing Guidelines because, as the Supreme Court has long emphasized that "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall*, 552 U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)); s*ee also United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *4-5 (D. Md. Feb. 18, 2020)("But if judges are not careful, a rote application of the Guidelines can turn what is often a life-defining moment for the defendant into a check-the-box, formulaic calculation devoid of the individualized sentencing we strive for.").

Overall, judges are encouraged to resist "anchoring" the sentence on the guideline numbers. "Anchoring is a cognitive bias that describes the human tendency to adjust judgments or assessments higher or lower based on previously disclosed external information - the 'anchor.' Studies demonstrate 'that

11

decisionmakers tend to focus their attention on the anchor value and to adjust insufficiently to account for new information.'" Mark W. Bennett, *Confronting Cognitive "Anchoring Effect" and "Blind Sot" Biases in Federal Sentencing: A Modest Solution for Reforming a Fundamental Flaw*, 104 J. Crim. L. & Criminology 489, 495 (2014) (citations omitted).

> It is important to distinguish the guidelines' intended, salutary effect - promoting consistency and proportionality in sentencing - from the unintended anchoring effect that the guidelines can exert. … Anchoring leads to cognitive error not insofar as judges intentionally use the guidelines in an advisory fashion, but instead when judges irrationally assign too much weight to the guidelines range, just because it offers some initial numbers.

*Id.* at 524 (inner quotation marks and citation omitted); *see also United States v. Docampo*, 573 F.3d 1091, 1105 n.5 (11th Cir. 2009) (Barkett, J., concurring and dissenting) ("Not only have district courts now become used to relying on [the Guidelines], but the Guidelines inevitably have a considerable anchoring effect on a district court's analysis").

## **ARGUMENT**

Mr. Betancur is a 22-year-old male, who seeks to further his education and eventually graduate from college. While the nature and circumstances of the January 6th events were indeed serious, his particular actions that day, paired with his individual history and characteristics do not lend itself to a sentence of 6 months incarceration. Rather, a sentence of one month incarceration and restitution would meet the purposes of sentencing, without being overly punitive. A one-month sentence would provide adequate deterrence to Mr. Betancur, avoid an unwarranted

sentencing disparities among other January 6th defendants and is warranted in light of his performance on pretrial release.

## I.   Nature and Circumstances of Mr. Betancur's Offense

The events of January 6th are seared into the nation's memory.  That day and the days after resulted in lost lives and over 1 million dollars in property damage. In addition, it caused trauma to politicians and staffers and their family members who were present there and who watched from a far.

Mr. Betancur understands the impact of the event on the nation.  However, he was not the cause of January 6th, nor was he in the category of people who caused physical harm to others or damage to the Capitol buildings.  He briefly entered the building, but his unlawful entrance cannot, and should not, be conflated with the many other, wider, failures that occurred that day.  Various factors led to the Capitol being breached, including "paralysis" "exacerbated by the patchwork nature of security across a city where responsibilities are split between local and federal authorities" and "driven by unique breakdowns inside each law enforcement agency."[21]  To characterize Mr. Betancur as the proximate cause of the January 6th event fails to acknowledge these other failures, and places an unjust blame on one non-violent, non-destructive individual.  The American system of justice, and specifically 18 U.S.C. § 3553(a), directs this Honorable Court to look at every

---

[21]     *See* Jacqueline Alemany, et. al., *Before, During, and After Bloodshed*, The Washington Post (Oct. 31, 2021), available at
https://www.washingtonpost.com/politics/interactive/2021/what-happened-trump-jan-6-insurrection/?itid=hp-top-table-main.

defendant and every defendant's actions individually. *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

Mr. Betancur traveled to Washington, D.C., from Silver Spring, MD and attended the rally. He walked from the rally into the Capitol building as Trump advised the crowd to do. See ECF 40, Gov't Ex. 1 at minute 0:00:21 (Trump states, "We're going to walk down and I'm be there with you." He was photographed outside of the Capitol building, on the scaffolding and at the windows. At some point, he entered the building briefly. Mr. Betancur did not break any windows to enter the Capitol. He did not assault any officers or anyone else. He did not dress in riot gear. He did not bring a weapon to the Capitol. Instead, he, along with hundreds of others, remained outside of the Capitol for the majority of the time he was on the Capitol grounds, and took photographs. Once inside of the Capitol, he did not take any items or search for documents inside the building.

On May 5, 2022, Mr. Betancur pled guilty to this offense. On June 23, 2022, Mr. Betancur and undersigned counsel were present for his telephonic Presentence Investigation Report interview. He agreed with the conduct described in the Statement of Offense. He later, through counsel, provided his mother's contact information to provide additional background information on his behalf.[22] He signed release forms for the Probation Office to conduct his background checks. On July 11, 2022, Mr. Betancur and undersigned counsel were present for the post-plea

---

[22]     Mr. Betancur also provided responses to the Draft PSR on July 19, 2022. Undersigned counsel (who was previously preparing for two trials) provided the responses and objections to the Probation Office and government counsel on August 1st.

interview pursuant to the plea agreement.  He admitted to being at the Capitol and going inside.  He provided information about what he observed and about what Proud Boys leaders doing on January 6th.  He admitted to being present at other rallies and recognizing some individuals present on January 6th, whom he had seen at prior rallies.[23]  Mr. Betancur did not seek a trial.  He admitted his conduct and is remorseful for his conduct.

## II.   **Mr. Betancur's History and Characteristics**

Mr. Betancur was born to a single mother and his father was not in his life. His biological father physically abused his mother and bullied him.  His father left when he was young and he and his mother are unsure of his whereabouts. ██

████████████████████████████████████████

Mr. Betancur was seen as an outsider by his extended family and teased for not having nice things, like a car.  That is why during the PSR interview, he explained that because he did not "have a place to belong" growing up, he joined far right extremist groups.  He is no longer part of any of those groups.  This behavior is consistent with others who join hate groups, many of whom "have suffered humiliation in some form, either bullying in their childhood at home by their

---

[23] The government contends that Mr. Betancur made "false statements" during the interview and stated, for example, that other individuals were at the Capitol but they were not.  ECF No. 39, at 24. The government does not provide any specifics.  During the interview, the FBI agent and Mr. Betancur noted that the incident was a very long time ago and he may not recall specific details. Mr. Betancur referred to a woman with a megaphone who was directing people.  The government's evidence is consistent with his statement. See ECF No. 39, at 22 (photo depicting Gina Bisignano, who was also pictured with a megaphone); see also Elise Wrabetz, *Jan. 6 rioter from Beverly Hills has second thoughts on her guilty plea*, NBC News, February 11, 2022, available at https://www.nbcnews.com/politics/justice-department/jan-6-rioter-beverly-hills-second-thoughts-guilty-plea-rcna15737) (photos of Bisignano with a megaphone).

parents and other adults."[24]   Furthermore, "[p]eople who join hate groups don't typically start off with the violent views they espouse. Rather, they join to find a sense of belonging and become radicalized after joining."[25]  For Mr. Betancur, lacking a positive male role model in his life made him susceptible to the sense of masculinity promoted by an organization like the Proud Boys --

> Dr. Tristan Bridges, a professor of sociology at the University of California, Santa Barbara, told Insider people who join hate organizations like the Proud Boys tend to be heavily invested in a specific view of masculinity and feel they have been denied their ability to achieve it.
>
> "Lots of men understand masculinity as implicitly tied to economic success, heterosexual access to women, achieving social status among groups of other men, and the like, and this is where groups like the Proud Boys come in," Bridges told Insider.[26]

In such organizations, a young man can feel a sense of power and identity when they feel their true identity is lacking.  Tony McAleer, a former hate group member, stated, "'I felt power where I felt powerless. I felt a sense of belonging where I felt invisible,'" in describing "the pull of the white nationalism that lured him to spend 15 years as a skinhead recruiter and an organizer for the White Aryan Resistance."[27]  Moreover, people join hate groups because they

---

[24]     Canela López, *The psychology of why people join the Proud Boys and other extremist hate groups*, Insider.com, available at https://www.insider.com/why-people-join-proud-boys-extremist-hate-groups-2020-10 (last accessed on Aug. 5, 2022).

[25]     López, footnote 23 *supra*.

[26]     López, footnote 23 *supra*.

[27]     Sharon Jayson and Kaiser Health News, *What Makes People Join Hate Groups? Unhappy childhood experiences can drive people to join white supremacist groups, studies have found.*, U.S. News & World Report, Aug. 23, 2017, available at usnews.com/news/national-news/articles/2017-08-23/what-makes-people-join-hate-groups-studies-say-childhood-torment-social-isolation, (last accessed on Aug. 5, 2022)

"find[] no other socially acceptable and meaningful ways to fulfill important needs — **the need for identity; the need for a feeling of effectiveness; the need for a feeling of connection**," .."Often, these are people who don't feel like they've succeeded or had a chance to succeed across normal channels of success in society. **They may come from families that are problematic** or families where they're exposed to this kind of extreme views of white superiority and nationalism. If you don't feel you have much influence and power in the world, you get a sense of power from being part of a community and especially a rather militant community."[28]

"Groups advocating white superiority have always preyed on young, impressionable people who are loners or had a traumatic thing in their background." [29]

Former white supremacist Christian Picciolini "travels around the world, using intervention strategies and outreach work to help young, predominantly white men leave racist and violence-based groups."[30]  He describes his approach as follows – "'It really is just identifying vulnerable young people and then amplifying their passions [and] trying to fill those voids in their life, because I've never met a happy white supremacist …I've never met one with positive self-esteem.'"

Mr. Betancur's mental health issues add a layer of complexity to the issue. Alvin F. Poussaint, a professor of psychiatry at Harvard Medical School, wrote in 2002, that extreme racism should be deemed a mental illness. Dr. Poussaint noted that "[t]he American Psychiatric Association has never officially recognized extreme racism (as opposed to ordinary prejudice) as a mental health problem, although the

---

[28]     Jayson, footnote 26 *supra* (emphasis added; inner quotation marks omitted).

[29]     Jayson, footnote 26 *supra* (inner quotation marks omitted).

[30]     Tonya Mosley, *Former White Supremacist Explains Why Young White Men Join Extremist Groups*, wbur.org, Aug. 9, 2019, available at https://www.wbur.org/hereandnow/2019/08/09/why-young-men-join-white-supremacist-groups, (last accessed on Aug. 5, 2022)

issue was raised more than 30 years ago."[31]  The APA rejected the recommendation, "arguing that because so many Americans are racist, even extreme racism in this country is normative—a cultural problem rather than an indication of psychopathology."[32]  Dr. Poussaint notes that the obvious problem is "[t]o continue perceiving extreme racism as normative and not pathologic is to lend it legitimacy. Clearly, anyone who scapegoats a whole group of people and seeks to eliminate them to resolve his or her internal conflicts meets criteria for a delusional disorder, a major psychiatric illness."[33]

In Mr. Betancur's case, his mental health issues are clear in the record.  As addressed in the Statement of Offense, Mr. Betancur "told his probation officer that he was paranoid about photographs people had taken of him" and he "believed the FBI was watching him."  ECF No. 35, ¶10.  During the PSR interview, he exhibited paranoia and questioned the identity for the probation officer during the telephonic interview.  After the interview, he contacted his pretrial services officer and explained that he said things he should not have said during the interview.  The pretrial officer contacted the probation officer and explained that Mr. Betancur has paranoia.  During his interview with government counsel and the FBI agent, he questioned the identity of the FBI agent and preferred to speak with the FBI agent he had communicated with on the day of his arrest.  ███████████████████

---

[31]     Alvin F Poussaint, *Is Extreme Racism a Mental Illness? Yes*, West J Med. 2002 Jan;176(1):4. doi: 10.1136/ewjm.176.1.4. PMID: 11788524; PMCID: PMC1071634, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1071634/ (last accessed on Aug. 5, 2022).

[32]     Poussaint, footnote 31 *supra*.

[33]     Poussaint, footnote 31 *supra*.

████████████████████████████████████████████

██████████. Taken together, Mr. Betancur was highly susceptible to an organization like the Proud Boys and thus highly susceptible to the vitriolic speech espoused on January 6th. However, Mr. Betancur has taken responsibility for his actions and pled guilty in this case. He seeks to maintain employment and pursue higher education.

### III. Overstated Criminal History and Request for a Variance

Mr. Betancur's criminal history is overstated. His prior offense was a Fourth Degree Burglary, which was tantamount to a trespass. His offense was a misdemeanor. He originally received probation. Due to his conduct in this case, and the heightened media scrutiny at the time of his arrest, the sentencing judge sentenced him to an outstanding 18 months of incarceration. Comparatively, a person who commits two trespass offenses would not receive such a lengthy sentence. Hence, the defense requests that the Court vary down the guidelines and treat Mr. Betancur as if he were in Criminal History Category I, which is what the parties anticipated at the time of his guilty plea.

### IV. Objections to the Failure to Give Acceptance of Responsibility

Mr. Betancur objects to the Probation Officer's refusal to subtract 2 levels for acceptance of responsibility for several reasons. First, as stated above, Mr. Betancur pled guilty to the offense. During the PSR interview, undersigned counsel informed the Probation Officer of Mr. Betancur's paranoia, which made it difficult for him to conduct the interview over the phone. Rather than delay the interview

for an in-person meeting, Mr. Betancur decided to proceed with the interview and did not want to delay the sentencing.  Lastly, Mr. Betancur provided signed releases for the Probation Office and agreed to and conducted an interview with the government pursuant to the plea agreement.

As detailed in the Application Notes to U.S.S.G. § 3E.1.1, Mr. Betancur truthfully admitted his conduct (1) at the time of the plea hearing, (2) during the PSR interview by agreeing the Statement of Offense, and (3) during his post-plea interview with the government.  Notably, a defendant may even "remain silent in respect to relevant conduct beyond the offense of conviction" and he would still be able to obtain a reduction for acceptance of responsibility.  See U.S.S.G. § 3E.1.1, App. Note 1.  Here, Mr. Betancur did not remain silent and admitted his guilt and agreed with the Statement of Offense in the three instances above.  Furthermore, he did not put the government to its burden of proof at trial.  See id. at App. Note 2. Hence, the appropriate guideline range in this case is 0 to 6 months.

## V.  A One-Month Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  Incarceration is not required in order for a sentence to reflect the seriousness of the offense.  Even, "a[] sentence of probation rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the

20

law is merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99). Here, a one-month sentence would reflect the seriousness of the offense.

To determine a just punishment for Mr. Betancur, the Court must also consider the conditions under which an individual will serve time if the Court decides to incarcerate the individual. Since the beginning of the COVID-19 pandemic, the virus spread rampantly in detention facilities. Thousands of BOP inmates have tested positive for COVID-19 and the latest BOP numbers show that 299 inmates have died from COVID-19.[34] With the rise of COVID-19 variants, the risks of contracting the virus and death remain a serious concern for inmates.

**VI.**     **A One-Month Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from the Unlikely Chance of Further Crimes of Mr. Betancur.**

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed—. . . to afford adequate deterrence to criminal conduct...[and] to protect the public from further crimes of the defendant." The public has been protected while Mr. Betancur has been on pretrial release. For the last ten (10) months, Mr. Betancur has complied with pretrial supervision requirements. The government alerts the Court to an altercation that Mr. Betancur

---

[34]     *See* Fed. Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last accessed July 5, 2022).

had on the metro.  It should be noted that Mr. Betancur was not arrested and no video footage of the incident was provided.  Furthermore, he disputes the allegations.

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016). Here, Mr. Betancur was sentenced to 18 months because of his conduct in this case. A six month sentence, which the government requests, would be overly punitive.

### VII.   A One-Month Sentence Would Not Create An Unwarranted Sentencing Disparity

Sentencing Mr. Betancur to one-month of incarceration would not contribute to an unwarranted sentencing disparity.  Nearly 200 defendants have been sentenced in these cases.[35]  A significant majority of the cases have been resolved as misdemeanor offenses. Of the misdemeanors cases, more than half have been sentenced to probation or home detention as a condition of probation.  January 6th defendants in other cases who pled to the *exact* same federal charge received probationary sentences.  *See United States v. Rachel Pert*, Crim. No. 21-cr-00139 (sentenced to 24 months' probation); *United States v. Jeffrey Witcher*, Crim. No. 21-cr-00235 (12 months' probation); *United States v. Nicholes Lentz*, Crim. No. 21-cr-00053 (1 month home detention and 36 months' probation).

---

[35]   This estimate is based on the government's chart, filed in other cases.

The government relies on cases very different from the one at hand for its requested sentence.  In *United States v. James Bonet*, Crim. No. 21-cr-121, Bonet entered Senator Merkley's office.  The government contends that the Senator's office was similar to the sensitive area of ST-2M, but does not explain how an area designated "ST-2M" is similar to a Senator's office.  In any event, Bonet, unlike Mr. Betancur, smoked marijuana inside of the Senator's office and then headed for the Crypt.  Bonet also described the protest as peaceful.  Furthermore, according to the government, Bonet also described officers as "'scumbags' before posting it on social media. As the officers fired crowd control munitions, Bonet yelled multiple times that they were 'pieces of s[$%!]' claiming they were 'shooting' at 'innocent protestors.'"  *See Bonet*, 21-cr-121, Gov't Sent. Memo, ECF No. 45, p.5.  Bonet also posted videos of himself at the Capitol claiming to be "taking [] back" the Capitol and footage of himself smoking marijuana.  Id. at pp. 6-9.  There are no such facts present here.

In *United States v. Phillip Bromley*, Crim. No. 21-cr-250, on which the government relies, Bromley plead to 18 U.S.C. 1752(a)(2), which involved disorderly and disruptive conduct[36] and is thus different from the offense to which Mr. Betancur pled guilty.  According to the government in that case, Bromley texted to friends, family, and coworkers that a violent response was needed for the 2020 election.  *See Bromley*, 21-cr-250, Gov't Sent. Memo, ECF No. 42, p.1-2.  Bromley "berated" Capitol Police officers and watched as his cousin "assaulted one of them."

---

[36]     *See Bromley*, 21-cr-250, Plea Agreement, ECF No. 37.

Id. at p. 3. Bromley also admitted that he aided in the destruction of property.  Id. Mr. Betancur did no such conduct in this case.

The government also relies on *United States v. Mariposa Castro*, Crim. No. 21-cr-299.  In that case, Castro pled guilty to 40 U.S.C. § 5104(e)(2)(G), which the government refused to offer in this case.  Castro "ransacked ST-2M and documented her fellow rioters both inside and outside of ST-2M," ECF No. 39 at 41, which Mr. Betancur did not do in this case.  Furthermore, according to the government in that case, Castro livestreamed to her Facebook viewers her intent to break into the Capitol.  *Castro*, 21-cr-299, Gov't Sent. Memo, ECF No. 40, p. 2.  She also expressed to her followers how "brave" she was entering the Capitol and encouraged them to be brave too.  Id. at p. 2.  There is no evidence that Mr. Betancur did the same.

The case of *United States v. Adam Avery Honeycutt*, Crim. No. 22-cr-50 is also different from the present case.  Honeycutt also plead to 40 U.S.C. § 5104(e)(2)(G). According to the government, Honeycutt posted several photos of a broken table leg from inside the Capitol, showing the barcode of the table leg.  Honeycutt, 22-cr-50, Gov't Sent. Memo, ECF No. 38, p. 16.  Honeycutt was a bails bondsman and "had a heightened responsibility to respect the law."  Id. at p.2.  After January 6th, Honeycutt denied his involvement on Facebook, "falsely claim[ing] that he 'wasn't with the rioters' and that he was actually 'at the food truck when the s[%$!] hit the fan.'"  Id. at 24.  Mr. Betancur did no such thing.

Another distinguishable case is *United States v. Annie Howell*, Crim. No. 21-cr-217.  According to the government in that case, Howell was recorded "screaming

'f[…] you' at the officers during this attack." *Howell*, 21-cr-217, Gov't Sent. Memo, ECF No. 35, p.12. Howell also sent a message to a Facebook group that she was inside the Capitol, and when a member of the Facebook group told her to leave, she responded, "'No…No… They just killlex (sic) two f[…]ing women… American women… No… I WATCHED THEM DIE… NO F[…]ING WAY." Id. at 14. There is no evidence that Mr. Betancur posted messages to a Facebook group and blatantly ignored advice to leave and that he decided to charge forward upon hearing that people had been killed inside the Capitol. Howell also made social media posts blaming the police for the riot. Id. at 16.

Lastly, the government relies on *United States v. Kelly O'Brien*, Crim. No. 21-cr-633. In that case, O'Brien "made a Facebook video post commending her other fellow rioters as 'really brave patriots' who have been subject to tear gas and rubber bullets." *O'Brien*, Gov't Sent. Memo, ECF No. 30, p. 2. She entered Speaker Pelosi's office suite and prior to entry, she "pointed to the prominently displayed sign 'Speaker of the House Nancy Pelosi' and told her fellow rioters that they needed to "smash" that area." Id. She also deleted posts from her Facebook account, "in an attempt to evade law enforcement detention." Id. at p. 16. No such conduct is present in Mr. Betancur's case.

To date, the only other case where the government requested a 6-month sentence for the 1752 misdemeanor is in *United States v. Gracyn Courtright*, Crim. No. 21-cr-72. In that case, Courtright entered the Capitol, shortly after the first few people engaged in a struggle with police. *Courtright*, Gov't Sent. Memo, ECF 26, p.

25

3. She was the front of the line of people chanting. She went to the Floor of the Senate chamber. She took the "Members Only" sign and carried it upstairs to the Senate Chambers. Id. at 6. She posted on social media that "Infamy is just as good as fame." Id. at 11. Mr. Betancur did no such thing.

In other cases, where defendants pled to the 1752 misdemeanor, the defendants received intermittent confinement as a part of probation for conduct more egregious than Mr. Betancur's. In *United States v. Blake Reed*, Crim. No. 21-cr-204. Reed discussed joining the Proud Boys. Reed, 21-cr-204, Gov't Sent. Memo, ECF No. 171, p.2. Reed posted a video of the crowd marching toward the Capitol which included the threat "we are coming for you." Id. Reed brought and used protective gear to the Capitol. Mr. Betancur did not. Reed encouraged his co-defendant to remove evidence. Mr. Betancur did not. Reed took steps to conceal electronic evidence on his phone. Mr. Betancur did not. Reed appears to have mocked law enforcement after the execution of the search warrant. Id. at p. 25. Mr. Betancur did not. Reed received 42 days of intermittent confinement as part of his probationary sentence.

In *United States v. Schornak*, 21-cr-278, the defendant received a sentence of 28 days of intermittent confinement and a term of probation. In that case, Schornak "traveled to the Visitor's Center and stole an American flag." *Schornak*, 21-cr-278, Gov't Sent. Memo, ECF 62, p. 11. Mr. Betancur did not steal anything. Schornak boasted about stealing the flag and causing tyranny inside the Capitol and he was "damn proud of it." Id. at 16. Mr. Betancur did not.

The government appears to argue that individuals who entered into sensitive spaces of the Capitol should receive stricter punishment.  See Gov't Sent. Mem. at 13.  However, in the cases where individuals entered private offices or sensitive spaces, their conduct was more egregious.  In *United States v. Derek Jancart*, 21-cr-148 (JEB), the defendant entered the Capitol within 5 minutes of the breach.  *See Jancart* 21-cr-148, Gov't Sent. Mem. ECF No. 25 at 5.  He went to the Speaker's conference room area.  While he did not go inside, he took a picture, and posted it online, stating " 'We're In[.]' " Id. at 6 (quoting Gov't Sent. Mem. at 6).  As the government stated in that case, Jancart "spread false propaganda [on Facebook] that the attack was 'peaceful[,]' comparing the riot to an 'unscheduled tour.' " Id. at 8.  Mr. Betancur did not spread false propaganda on social media after Jan. 6th.

In *United States v. Erik Rau*, 21-cr-467, the defendant entered the Capitol within 5 minutes of the breach.  Rau also went inside of the Speaker's conference room.  According to the government, Rau brought a medical kit, Kevlar gloves, and wore tactical pants.  *Rau*, 21-cr-467, ECF No. 13, Gov't Sent. Mem. at 8.  Rau also deleted text message from his cell phone.  Id. at 9.   Mr. Betancur did not wear tactical gear and did not come equipped for a fight.

In *United States v. Oliver Sarko*, 21-cr-591, the defendant made incendiary statements while inside the Capitol on video:  "Where are the traitors?" "Bring out Pelosi!" "We won't let you steal this country." "We're actually breaking in right now." "Fight for Trump!" "Beijing Biden will never be president, we reject communism."  *Sarko*, 21-cr-591, ECF 31, Gov't Sent. Mem. at 11.  In that case, the

government noted that since Sarko live streamed these incendiary statements on Snapchat, "anyone else who accessed Snapchat, potentially millions of persons, including other January 6, rioters, could have listened to those remarks when they were made" and his "demands to 'bring out' Nancy Pelosi" and "to find the 'traitors' were particularly chilling because they could have been seen as a call to arms to other rioters to take violent action inside the Capitol." Id. at 11.  Mr. Betancur made no such remarks.

In *United States v. Brian Stenz*, 21-cr-456, the defendant entered the Capitol and appeared to take a puff of possibly THC from a vaping pen upon entering. *Stenz*, 21-cr-456, ECF No. 32, Gov't Sent. Mem. at 5.  It appears that he went to Senator Merkley's office and remained there for 4 minutes.  Stenz took a picture of the Senator's office and sent it to a friend.  Senator Merkley noted that people appeared to have been "smoking something" in his office.  Id. at 7.  Unlike Mr. Betancur, Stenz did not mention going into the Senator's office during his FBI interview.

Of the nine factors that the government deems to be critical in these cases, most of them are mitigating factors in Mr. Betancur's case.  First, it is unclear when he entered the Capitol and he did not break any windows to gain entry.  Second, Mr. Betancur did not encourage violence.  Third, he did not encourage property destruction.  Fourth, there is no evidence of significant reaction to violence or destruction.  Fifth, during or after the riot, he did not destroy evidence.  Sixth, Mr. Betancur was inside the building for a "relatively brief" amount of time and he did

not enter the Senate or House chambers where members of Congress were gathering to certify the election.  Seventh, he did not make any notable posts on social media.  Eighth, he cooperated with law enforcement.  And ninth, he has demonstrated remorse.

## **<u>Conclusion</u>**

Considering the § 3553(a) sentencing factors, a one-month sentence and restitution in the amount of $500, is a sufficient, but not greater than necessary, sentence to satisfy the purposes of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Ubong E. Akpan
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500